# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

EQUAL EMPLOYMENT
OPPORTUNITY COMMISSION,

                              Plaintiff,

v.

AURORA HEALTH CARE, INC.,

                              Defendant.

Case No. 12-CV-984-JPS

ORDER

The Equal Employment Opportunity Commission ("EEOC") filed this case against Aurora Health Care, Inc. ("Aurora"), on September 26, 2012. (Docket #1). The EEOC alleges that Aurora violated various provisions of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101, *et seq.*, in discriminating against Kelly Beckwith[1] by rescinding an offer of employment to her after learning that she was diagnosed with multiple sclerosis ("MS"). (Docket #1).

The case was originally assigned to Magistrate Judge William Callahan, and the parties consented to proceed before him. (Docket #2, #6). The parties filed cross-motions for summary judgment on November 3, 2014. (Docket #71). They fully briefed those motions (Docket #72, #79, #89, #98, #109, #114), but Magistrate Judge Callahan did not address them before relinquishing his case assignments in anticipation of retirement. Upon Magistrate Judge Callahan's relinquishment of this case, Aurora refused to proceed before Magistrate Judge William Duffin. (Docket #123). The case

---

[1]The EEOC originally alleged claims on behalf of another individual, but agreed to dismiss that individual's claims from this lawsuit. (Docket #14).

was, thus, randomly re-assigned to this Court. The motions for summary judgment being fully briefed, the Court turns to decide them.

## 1.    BACKGROUND

The Court begins with a discussion of the factual background. The parties largely disagree as to the facts, and the Court will note such instances. Unless otherwise indicated, the parties agree as to the Court's references to the facts. "As with any summary judgment motion, [the Court] review[s] cross-motions for summary judgment 'construing all facts and drawing all reasonable inferences from those facts, in favor of the non-moving party.'" *Laskin v. Siegel*, 728 F.3d 731, 734 (7th Cir. 2013) (quoting *Wis. Cent., Ltd. v. Shannon*, 539 F.3d 751, 756 (7th Cir. 2008)). *See also United States v. P.H. Glatfelter Co.*, 768 F.3d 662, 668 (7th Cir. 2014).

### 1.1    General Information About Aurora's Hiring Practices

#### 1.1.1    The Aurora Visiting Nurse Association

Aurora operates the Aurora Visiting Nurse Association ("AVNA"). (Aurora PFF ¶ 1; EEOC PFF ¶ 1).[2] AVNA provides home care and hospice

---

[2]The Court will cite to each party's proposed findings of fact (Aurora's at Docket #80; EEOC's at Docket #73) as "[Party's] PFF." Where the Court references a response to proposed findings (EEOC's at Docket #90; Aurora's at Docket #99), it will cite to "[Party's] Resp. to [Opposing Party's] PFF." Where the Court references Aurora's reply to EEOC's response (Docket #115), the Court cites to "Aurora Rep. to EEOC Resp. to Aurora PFF." Where the Court references a party's supplemental statement of facts, offered to support the response to the opposing party's motion for summary judgment (Aurora's at Docket #100; EEOC's at Docket #91), the Court cites to "[Party's] SPFF." Finally, the Court refers to the respective responses to supplemental facts (Aurora's at Docket #117; EEOC's at Docket #110) as "[Party's Resp.] to [Opposing Party's] SPFF."

services to patients. (Aurora PFF ¶ 1). To accomplish this, Aurora hires nurses to work unsupervised in the homes of patients. (Aurora PFF ¶ 3).[3]

### 1.1.2 The Pre-Employment Physical

After receiving an offer of employment, prospective employees (including prospective AVNA nurses) were required to pass a physical examination. (Aurora PFF ¶ 10). One purpose of this pre-employment physical is to determine whether prospective employees will need any accommodations to perform their jobs. (EEOC PFF ¶ 51).

Prior to any physical examination, a prospective employee received and was required to fill out a Medical History and Physical Examination form (the "Form"). (Aurora PFF ¶ 12).[4] The Form included a three-page "history" section, that directed prospective employees to check a "yes" box for any of a number of listed symptoms that the prospective employee "[was] experiencing or [had] experienced." (Aurora PFF ¶ 14; EEOC Resp. to Aurora PFF ¶ 14). The form also asked prospective employees to list "current

---

[3] The EEOC objects to this as immaterial. It argues that the description of the job Ms. Beckwith was offered does not specifically indicate that work would be performed in-home and unsupervised. (EEOC Resp. to Aurora PFF ¶ 3). But the job description requires employees to obtain transportation to "home visits" and be sufficiently mobile to "gain entry to patients['] residence." (Docket #119, Ex. W at 3). Aurora also produced an interrogatory answer indicating that in-home nurses work "without supervision or other oversight." (Docket #76, Ex. 13 ¶ 18). Thus, it appears clear that there was at least *some* expectation that AVNA nurses would provide in-home care without supervision.

The EEOC also disputes the position title, but Aurora points out that, regardless of the title, the position description is identical, mooting this dispute. (Aurora Rep. to EEOC Resp. to Aurora PFF ¶ 3).

[4] The EEOC objects to this as incomplete, providing additional information about Ms. Beckwith's specific situation. (EEOC Resp. to Aurora PFF ¶ 13). The Court will address that specific information in further detail, below.

medications," but did not provide any specific guidance regarding whether the prospective employee was required to list all medications *currently prescribed* or, rather, all medications that were *actually being taken* at the time. (Aurora PFF ¶ 15).[5] The form also contained the following statement:

> I understand that this is an evaluation and that my participation does not imply a Doctor/Patient relationship with the examining medical provider. I hereby certify that I have carefully read and completed the following questions, that I understand them and that the information given is complete, true and accurate to the best of my knowledge. I understand that the falsification or misrepresentation of any of the information, or the failure or neglect to disclose any information requests [sic], may be grounds for termination, regardless of when such falsification, misrepresentation, failure or neglect may be discovered.

(Aurora PFF ¶ 13).[6] In addition to completing the Form, the prospective employee was also required to sign an authorization, agreeing that any medical information previously prepared by an Aurora provider, such as a medication list, could be disclosed. (Aurora PFF ¶ 16; EEOC PFF ¶ 60).

Typically, after the prospective employee finished filling out the Form, a licensed practical nurse ("LPN") or medical assistant ("MA") measured the prospective employee's vital signs, blood pressure, height, and weight; administered a vision and grip test; and, occasionally, drew the prospective

---

[5]The parties disagree over the meaning of this and what Aurora expected prospective employees to disclose in response. (Aurora PFF ¶ 15; EEOC Resp. to Aurora PFF ¶ 15).

[6]The EEOC objects to this as immaterial, but does not dispute that the Form does actually contain this statement. (EEOC Resp. to Aurora PFF ¶ 13).

employee's blood. (Aurora PFF ¶ 17).[7] The LPN or MA also performed a medication reconciliation, reviewing prescriptions listed on the Form or in the prospective employee's medical file. (Aurora PFF ¶¶ 18–19; EEOC PFF ¶ 66).[8] After the LPN or MA had completed the initial examination and review, a physician, physician's assistant ("PA"), or nurse practitioner would review the Form with the prospective employee and perform the actual physical examination. (Aurora PFF ¶¶ 11, 21).[9] Then, after the physical examination, the prospective employee typically underwent a drug screen. (Aurora PFF ¶ 23).[10]

Depending on the outcome of the physical examination, the prospective employee would either "pass" or be asked to provide more information. (Aurora PFF ¶ 24). In the latter event, Aurora's Employee Health Department would receive notice that employment was "on

---

[7]The EEOC objects to this on foundation and materiality grounds. (EEOC Resp. to Aurora PFF ¶ 17). But the cited sources support the proposition and, while the information is general, the Court will discuss Ms. Beckwith's more specific circumstances further below.

[8]The EEOC disputes this (EEOC Resp. to Aurora PFF ¶¶ 18–19), but Aurora's sources clearly support the general nature of the medication reconciliation (*see* Aurora PFF ¶¶ 18–19 (citing Docket #92, Ex. 2 at 18, 24–26, 31); Aurora Rep. to EEOC Resp. to Aurora PFF ¶¶ 18–19 (citing Docket #81, ¶ 3; Docket #84, ¶ 2; Docket #92, Ex. 2 at 1, 26–28; Docket #92, Ex. 6 at 82)).

[9]The EEOC disputes this, largely on the basis that it believes Ms. Beckwith was subject to a different process (EEOC Resp. to Aurora PFF ¶ 21 (citing EEOC PFF ¶ 17)), but there is no good faith basis to object to Aurora's proffered evidence that this was the way the physical examination *typically* occurred.

[10]Again, the EEOC disputes this, on the basis that the sequence of events for Ms. Beckwith was allegedly different (EEOC Resp. to Aurora PFF ¶ 21 (citing EEOC PFF ¶ 17)), but the Court is not discussing that specific situation at this time.

hold" until the required additional information was received. (Aurora PFF ¶¶ 24–25).

Aurora has, in the past, hired individuals with MS diagnoses when those individuals disclosed their diagnoses during their physical examinations. (Aurora PFF ¶ 106).

### 1.1.3  Aurora's Honesty Policy

Aurora generally expects that all of its employees and prospective employees—including AVNA nurses—will not provide false or misleading information. (Aurora PFF ¶ 4). Its Caregiver Accountability Policy states that "dishonesty or falsification or unauthorized altering of…employment applications" may result in discharge. (Aurora PFF ¶ 5).[11] Thus, Aurora occasionally rescinds offers of employment when it discovers that a prospective employee has been dishonest. (Aurora PFF ¶¶ 6, 8, 9, 26, 27,

---

[11]The EEOC objects to the Caregiver Accountability Policy as incomplete and immaterial, asserting that there is no indication that: (1) the Caregiver Accountability Policy applies to job applicants; or (2) was applied to Ms. Beckwith. (EEOC Resp. to Aurora PFF ¶ 5). But the Court agrees with Aurora that this proposed finding is essentially undisputed. (Aurora Rep. to EEOC Resp. to Aurora PFF ¶ 5). The EEOC does not dispute that the Caregiver Accountability Policy includes the quoted phrase. (EEOC Resp. to Aurora PFF ¶ 5; *see also* Docket #108, Ex. 4). And the EEOC mischaracterizes the deposition testimony of Mary Doherty, a supervisor at Aurora whom the Court will discuss more later in this order, as indicating she did not rely on the Caregiver Accountability Policy when, in fact, she answered questions regarding a policy much more generally, at most indicating her primary reliance on a certification on an exam form. (*See* Docket #92, 22:5–23:4, 42:15–19, 72:9–73:6, 79:11–15).

107).[12] Aurora generally makes a decision after reviewing the circumstances of the individual case; on occasion, Aurora has even hired individuals who disclosed information during their physical examination that they did not previously disclose on the Form. (Aurora PFF ¶ 28, 108).[13] Aurora has, however, rescinded offers when applicants have not disclosed "significant medical history." (EEOC PFF ¶ 49).

## 1.2    Ms. Beckwith's Specific Circumstances

### 1.2.1    Ms. Beckwith's Medical Condition

Ms. Beckwith was diagnosed with relapsing-remitting MS in 2005 after reporting to her doctor occasional weakness, numbness upon bending over, and shaking of her right eye. (Aurora PFF ¶ 29; EEOC PFF ¶¶ 8–9, 15, 33). Relapsing-remitting MS (which the Court will refer to simply as "MS" for the remainder of this order) is a form of MS that involves "flare-up" periods in which symptoms are pronounced and other periods in which symptoms are nonexistent. (EEOC PFF ¶ 11). However, even during times when Ms. Beckwith is not displaying symptoms, she still has MS. (EEOC PFF ¶ 14). Ms. Beckwith has been prescribed Rebif by her neurologist, Dr. Bhupendra

---

[12]The EEOC disputes this (EEOC Resp. to Aurora PFF ¶¶ 6, 8, 9, 27), but there is ample evidence to support the fact that Aurora has, on multiple occasions, rescinded offers of employment for dishonesty—perhaps most often for non-medical reasons (Docket #83, Ex. 1). Moreover, the EEOC does not dispute that "Aurora's practice regarding falsification and dishonesty applies to the pre-employment physical process." (EEOC Resp. to Aurora PFF ¶ 26). The EEOC also objects that Aurora's answers are incomplete, because they do not fully describe the investigation that typically occurs when a job applicant appears to have been dishonest. (EEOC Resp. to Aurora PFF ¶ 9). The Court will address that dispute in further detail in discussing Ms. Beckwith's specific circumstances.

[13]The EEOC disputes Aurora's assertion that it makes a decision as to whether to rescind an offer after an investigation, but bases that dispute on Ms. Beckwith's specific circumstances (EEOC Resp. to Aurora PFF ¶ 28), which the Court will address later.

Khatri, since she was first diagnosed with MS, although she has not been entirely compliant with her medication. (Aurora PFF ¶ 30; EEOC PFF ¶¶ 8, 16).

The parties disagree over the extent to which Ms. Beckwith is affected by her MS, but seem to agree that her symptoms are relatively mild. For example, the numbness and shaky vision that Ms. Beckwith originally complained of would go away upon standing straight and closing her eye, respectively. (Aurora PFF ¶ 36).[14] Ms. Beckwith testified at her deposition that her symptoms did not affect her activities or bodily functions, at least in 2005 when she initially reported her symptoms to her doctor. (Docket #32, Ex. 1 at 105:15–106:14, 161:1–23, 171:21–173:24).[15] Indeed, Dr. Khatri has described Ms. Beckwith's 2005 symptoms as mild, minimal, and not disabling. (Docket #92, Ex. 7 at 41:3–5, 71:13–20, 78:24–79:1).[16]

---

[14]The EEOC disputes this, arguing that Aurora has not fully addressed the time period in which Ms. Beckwith suffered; it does not, however, dispute the fact that the numbness and shaky vision would go away with action by Ms. Beckwith. (EEOC Resp. to Aurora PFF ¶ 36).

[15]Aurora cites this testimony to support its assertion that Ms. Beckwith's 2005 symptoms were of little impact. (Aurora PFF ¶¶ 37, 38). The EEOC objects, arguing that Dr. Khatri's testimony is to the contrary and that Ms. Beckwith's statement is an inadmissible legal conclusion of a lay witness. (EEOC Resp. to Aurora PFF ¶¶ 37, 38). The Court, however, relies on the testimony only for the general proposition that Ms. Beckwith's symptoms were relatively mild; in the end, there are ultimately issues of fact as to whether Ms. Beckwith was disabled at the time of her physical examination.

[16]The EEOC cites to other testimony from Dr. Khatri to support its contention that Ms. Beckwith's brain would be functioning abnormally during even a minor "flare-up." (EEOC Resp. to Aurora PFF ¶ 39). While this may be true, it does not undermine Dr. Khatri's testimony that Ms. Beckwith's 2005 symptoms were mild.

After 2005, Ms. Beckwith's MS has been stable. (EEOC PFF ¶ 32). Her shaky vision has not returned. (Aurora PFF ¶ 40). The parties seem to agree that she did not have any flare-ups between 2006 and 2009. (Aurora PFF ¶ 56; EEOC Resp. to Aurora PFF ¶ 56; EEOC PFF ¶ 28). And, at least prior to 2009, the numbness or weakness issues occurred infrequently and were of limited effect. (Docket #92, Ex. 1 at 106:22–109:7; Docket #119, Ex. 10 at 114:17–116:23).[17] However, Ms. Beckwith has continued to suffer from other symptoms, including fatigue, pain, and depression; the parties disagree over whether these symptoms can be attributable to her MS. (Aurora PFF ¶¶ 42, 43; EEOC Resp. to Aurora PFF ¶¶ 42, 43; EEOC PFF ¶¶ 21–22). It is clear, however, that at all times relevant to this litigation, Ms. Beckwith was diagnosed with MS and that there is no cure for her condition. (EEOC PFF ¶ 10; Aurora Resp. to EEOC PFF ¶¶ 10, 38).[18]

In any event, the parties agree that, in 2009, during the relevant time period, Ms. Beckwith reported to Dr. Khatri that she was doing well (Aurora

---

[17]Again, the Court cites to Ms. Beckwith's testimony for the general proposition that, after 2005 and before 2009, Ms. Beckwith viewed her symptoms as mild and of little effect. Dr. Khatri's medical notes, cited by the EEOC (EEOC Resp. to Aurora PFF ¶ 41) cannot undermine Ms. Beckwith's testimony regarding her perception of the effects of her MS. The Court also is not relying on Ms. Beckwith's testimony to reach a legal conclusion regarding her disability.

[18]Aurora takes issue with the EEOC's description of Ms. Beckwith as "suffer[ing]" from MS, but does not disagree that her diagnosis has remained consistent throughout the relevant time period. (Aurora Resp. to EEOC PFF ¶ 10).

PFF ¶ 47),[19] although she may have had decreased vibratory sense perception in her toes (EEOC PFF ¶ 26).[20] Despite the fact that she was doing well, though, Dr. Khatri instructed Ms. Beckwith to continue taking Rebif. (Aurora PFF ¶ 49).

Importantly, the parties agree that, during the relevant time period, Ms. Beckwith was capable of performing the essential functions of the position for which she applied. (EEOC PFF ¶ 79).

### 1.2.2   Ms. Beckwith's Hiring Process

In August of 2009, Ms. Beckwith applied online for a Hospice Care Coordinator position with AVNA. (Aurora PFF ¶ 57; EEOC PFF ¶ 52). In filling out her application, Ms. Beckwith clicked a "Continue" button certifying that Aurora might withdraw an offer of employment if it became clear that Ms. Beckwith had provided untruthful information in the

---

[19] It seems that Ms. Beckwith has had periods of numbness in the time after she applied for work with AVNA. (EEOC PFF ¶ 24; Aurora Resp. to EEOC ¶ 24). A more recent MRI, taken in 2012, shows that the lesions on Ms. Beckwith's brain and spinal cord are worsening and there has been scarring of her neurological systems. (EEOC PFF ¶¶ 34, 35). However, Ms. Beckwith's post-2009 symptoms are ultimately immaterial to her claims in this case.

[20] As Aurora points out, Dr. Khatri reported a decrease in vibratory sense perception, but Ms. Beckwith did not. (Aurora Resp. to EEOC PFF ¶ 26).

application process. (Aurora PFF ¶ 58; EEOC PFF ¶¶ 53–55; Aurora Resp. to EEOC PFF ¶ 55).[21]

After reviewing Ms. Beckwith's application and interviewing her, Aurora offered her employment with AVNA. (Aurora PFF ¶ 60; EEOC PFF ¶ 56, 57).[22] This offer of employment was contingent upon Ms. Beckwith passing a pre-employment physical. (Aurora PFF ¶ 62; EEOC ¶ 57).

Ms. Beckwith scheduled her physical at an Aurora facility in West Bend, Wisconsin, near her home. (Aurora PFF ¶ 63; EEOC Resp. to Aurora PFF ¶ 63). Before this time, Ms. Beckwith was a patient of an Aurora primary care doctor, who worked from a number of Aurora facilities. (Aurora PFF ¶ 63; EEOC Resp. to Aurora PFF ¶ 63; EEOC PFF ¶ 58). Ms. Beckwith was

---

[21]The EEOC argues that Ms. Beckwith did not actually acknowledge having seen this document. (EEOC Resp. to Aurora PFF ¶ 58). But, contrary to the EEOC's representations, the exact language quoted by Aurora appeared in Exhibit 1 of Ms. Beckwith's deposition and Ms. Beckwith testified that she believed she remembered seeing it. (Docket #92, Ex. 1 at 23:23–24:9; Docket #119, Ex. 1 at 7 (Ex. 1 to Beckwith Dep.; internal numbering: AURORA-KB 000260)). Additionally, Aurora has produced uncontroverted evidence that, in 2009, Ms. Beckwith could not have completed the online application process without having clicked the "Continue" button, thus acknowledging that Aurora could rescind an offer for untruthfulness. (Docket #101, ¶¶ 3–6; Docket #101, Ex. A). The Court also notes that this relates to Aurora's waiver defense, *see* Section 2.2.4, *infra*; if Aurora pursues that defense through to trial, it will be required to prove that Ms. Beckwith actually agreed to the terms of that waiver.

[22]Again, the Court notes that the parties dispute which position Ms. Beckwith was offered. (Aurora PFF ¶ 60; EEOC Resp. to Aurora PFF ¶ 60). The EEOC asserts that Ms. Beckwith was offered the position of Hospice Care Coordinator, simply because that is the position that she *applied* for. (EEOC Resp. to Aurora PFF ¶ 60). This is impossible to square with the fact that Ms. Beckwith's offer letter lists the position title as "Registered Nurse Care Coordinator - Home Hospice - Sheboygan Plymouth." (Docket #19, Ex. 1 at 10 (Ex. 12 to Beckwith Dep.; internal numbering EEOC000384)). In any event, the positions apparently had identical descriptions, so this is of little relevance. (Aurora Rep. to EEOC Resp. to Aurora PFF ¶ 3).

told to arrive approximately 15 minutes early for her pre-employment physical and expected that—consistent with other pre-employment physicals that she had participated in for other medical employers—she might be expected to answer medical questionnaires. (Docket #119, Ex. 10 at 67:15–69:10).[23]

On September 23, 2009, Ms. Beckwith arrived at Aurora for her physical examination and was, indeed, asked to fill out, among other things, a medical questionnaire: the Form, described in Section 1.1.2, *supra*. (Aurora PFF ¶ 65; EEOC PFF ¶ 59–60).[24] She filled the Form out without asking any questions of the staff. (Aurora PFF ¶ 66).

The Form included a section directing Ms. Beckwith to "check below if you are experiencing or have experienced any of the following, explain all 'Yes' answers below in the comments section or on the back of this page, and include dates." (Docket #92, Ex. 9 at 2; EEOC PFF ¶ 62). Importantly, Ms. Beckwith checked "No" to the following symptoms: "Vision/Eye Problems," "Numbness/Tingling," and "Depression." (Docket #92, Ex. 9 at 2). She answered "No" in spite of the fact that she had, in fact, previously

---

[23]The EEOC argues that Ms. Beckwith did not have any indication of what forms she might have to fill out. (EEOC Resp. to Aurora PFF ¶ 64). But Ms. Beckwith's deposition testimony clearly supports the contention that she expected to fill out medical questionnaires, consistent with the ones Aurora asked her to complete. (Docket #119, Ex. 10 at 67:15–69:10).

[24]The EEOC disagrees over whether Ms. Beckwith was asked to fill out *other* forms upon arrival, but appears to agree that she was asked to fill out the Form when she arrived. (EEOC Resp. to Aurora PFF ¶ 65).

experienced each of those symptoms. (Aurora PFF ¶ 70).[25] The EEOC asserts that Ms. Beckwith's answers were not incorrect, as Ms. Beckwith had not experienced the symptoms for a long period of time and the checkboxes were only to be checked for symptoms that had not resolved. (EEOC SPFF ¶¶ 36, 40). Aurora disagrees. (*See* Aurora SPFF ¶ 51).

The Form also included a section asking Ms. Beckwith to list "Current Medications (includ[ing] over-the-counter and prescription)." (Docket #92, Ex. 9 at 2; EEOC PFF ¶ 62). In filling out that section of the Form, according to Ms. Beckwith, she did not disclose her prescription to Rebif because she was not compliant with the medication at that time. (Docket #119, Ex. 10 at 82:1–19).

The parties dispute precisely what happened after Ms. Beckwith had completed the Form.

*Aurora's version of events.* Aurora asserts that LPN Karla Teetzen next took Ms. Beckwith's vitals and reviewed Ms. Beckwith's medications. (Aurora PFF ¶ 71). In reviewing Ms. Beckwith's medications, LPN Teetzen[26] performed a medication reconciliation, comparing Ms. Beckwith's medical records with what Ms. Beckwith had written on the Form (remember, Ms. Beckwith was previously an Aurora patient and agreed that her medical

---

[25]The EEOC objects to this, asserting that Aurora and Ms. Beckwith did not understand the Form to require disclosure of past conditions that had resolved. (EEOC Resp. to Aurora PFF ¶ 70). The Court will further discuss that issue later in this order. But it is clear that the EEOC does not disagree with the fact that Ms. Beckwith checked "No" to the vision, numbness, and depression boxes, despite having previously experienced those symptoms. (EEOC Resp. to Aurora PFF ¶ 70).

[26]Given the amount of individuals involved in this case, the Court will reference the individuals by both a proper title (for instance, LPN), together with the individual's last name (for instance, Teetzen). Hopefully, this will assist the reader in separating between the various individuals.

records could be accessed). (Aurora PFF ¶¶ 71, 72). Doing so, LPN Teetzen noticed that Ms. Beckwith's medical records showed a prescription to Rebif that Ms. Beckwith had not disclosed. (Aurora PFF ¶¶ 72, 73). LPN Teetzen asked Ms. Beckwith about this, and Ms. Beckwith stated that she took Rebif "most of the time." (Aurora PFF ¶ 72).

After LPN Teetzen performed her initial review, PA Margaret Hays performed the physical examination of Ms. Beckwith. (Aurora PFF ¶ 74). In doing so, and consistent with her typical practice, PA Hays reviewed the Form with Ms. Beckwith, asking Ms. Beckwith about specific portions of the Form. (Aurora PFF ¶¶ 75–77). Based upon Ms. Beckwith's responses, PA Hays added information to the Form, most importantly: (1) the word "None" in response to "Current Medications"; (2) "No restrictions" in a box titled "Work Restriction"; and (3) "Denies" in response to "Current Medical Problems." (Aurora PFF ¶¶ 78–80).

After that time, PA Hays exited the examination room. (Aurora PFF ¶ 81). LPN Teetzen then told PA Hays that Ms. Beckwith was prescribed Rebif, as LPN Teetzen had discovered while performing the medication reconciliation. (Aurora PFF ¶ 81).

This prompted PA Hays to return to the examination room to discuss the issue with Ms. Beckwith. (Aurora PFF ¶ 82).[27] PA Hays returned while Ms. Beckwith was undergoing a drug test and stated that she noticed that

---

[27]The EEOC challenges PA Hays' declaration as not relying on personal knowledge, which would make it inadmissible under Fed. R. Ev. 602. (EEOC Resp. to Aurora PFF ¶ 82). While a jury might discount the credibility of PA Hays' ability to recall the circumstances of Ms. Beckwith's examination from her notes, the Court finds that her recollection relies on her personal knowledge and satisfies Fed. R. Ev. 602. If the EEOC can provide additional legal authority to dispute that finding, it may file a motion *in limine* seeking to bar PA Hays' testimony.

Ms. Beckwith was prescribed a very serious medication. (Aurora PFF ¶ 82). Ms. Beckwith asked whether PA Hays was referring to Rebif. (Aurora PFF ¶ 83). PA Hays responded affirmatively, after which Ms. Beckwith stated that she took Rebif for MS. (Aurora PFF ¶ 83).

Having found out that Ms. Beckwith was diagnosed with MS and prescribed Rebif to treat the condition, PA Hays added that information to the Form. (Aurora PFF ¶¶ 86, 87). PA Hays also requested that Ms. Beckwith sign a release that would allow Dr. Khatri to disclose information regarding Ms. Beckwith's MS and course of treatment. (Aurora PFF ¶ 88). (Shortly thereafter, Dr. Khatri provided this information in a letter dated September 24, 2009, indicating that Ms. Beckwith's MS would not cause any restrictions. (Aurora PFF ¶ 89)).

After Ms. Beckwith's examination was complete, PA Hays called Nancy Kensmoe (an employee health specialist, so the Court will refer to her as "EHS Kensmoe"), who was responsible for making sure that AVNA nurses could meet the physical demands of their jobs. (Aurora PFF ¶ 90).[28] PA Hays explained that she had placed a hold on Ms. Beckwith's employment and that Ms. Beckwith had not been forthcoming with

---

[28]The EEOC requests that the Court strike PA Hays' declaration as a "sham" affidavit, because she testified during her deposition that she did not recall certain things and her memory was not refreshed by looking at a copy of the Form. (*E.g.,* EEOC Resp. to Aurora PFF ¶ 90; Docket #89 at 30–31). This is not a situation where PA Hays testified at her deposition in a way that contradicts her later declaration, and thus it is not analogous to *Ineichen v. Ameritech*, 410 F.3d 956, 963 (7th Cir. 2005), which the EEOC cites. *Ineichen* involved a situation in which an individual testified "unequivocally" at a deposition that an individual had never made a specific comment. Her later attempt to provide a precisely contrary view was struck as a sham. Here, on the other hand, PA Hays' general lack of memory at a specific time is not specifically contradicted by her later memory. Indeed, that is often the nature of memory. This is a matter that may prove fruitful to attack PA Hays' credibility, but it is not a basis to strike PA Hays' declaration.

information regarding her MS and prescription to Rebif. (Aurora PFF ¶ 91).[29] EHS Kensmoe took this to mean that Ms. Beckwith had not disclosed her MS or prescription while filling out the Form or during the initial physical examination, despite PA Hays having specifically asked about such information. (Aurora PFF ¶ 92).[30] EHS Kensmoe believed that Ms. Beckwith had disclosed that information only after PA Hays had learned about it from LPN Teetzen and returned to the examination room to confront Ms. Beckwith. (Aurora PFF ¶¶ 92, 93). Essentially, EHS Kensmoe believed that Ms. Beckwith had been deceptive in not disclosing her MS and prescription in spite of having been asked on the Form and by PA Hayes. (Aurora PFF ¶¶ 94, 95).

EHS Kensmoe discussed her concerns with her supervisor, Mary Doherty ("Supervisor Doherty"). (Aurora PFF ¶¶ 96, 97). Supervisor Doherty believed that both EHS Kensmoe and PA Hays viewed Ms. Beckwith's course

---

[29]The EEOC asserts that this finding is based upon hearsay. (EEOC Resp. to Aurora PFF ¶ 91). It may, indeed, be correct. However, the Court need not resolve the issue in this order, because the fact is not material to resolution of the summary judgment motions. But, at trial, if the fact arises, the Court may be called upon to resolve a hearsay issue.

[30]The EEOC also challenges this finding as being based on hearsay. (EEOC Resp. to Aurora PFF ¶ 92). As the Court will discuss further, below, where Aurora has produced statements of others to support a contention regarding a party's own belief, it appears that Aurora is not offering the statements for the truth of the matters asserted. The EEOC makes a similar challenge to other of Aurora's proposed findings, including numbers 92, 93, 94, 95, 96, and 97. The Court will not address those disputes separately. And, where statements are not offered for the truth of the matters asserted, they are, of course, admissible.

of behavior as dishonest. (Aurora PFF ¶ 98).[31] Thus, Supervisor Doherty directed EHS Kensmoe to have Lisa Splittgerber, a human resources employee with AVNA, rescind Ms. Beckwith's offer of employment on the basis of Ms. Beckwith's dishonesty in the physical examination process. (Aurora PFF ¶¶ 99, 100).[32] Ms. Splittgerber, in turn, had another human resources employee, Becky Hampton, contact Ms. Beckwith to rescind the offer. (Aurora PFF ¶ 101). Ms. Hampton did not know the full nature of Ms. Beckwith's alleged dishonesty—only that the nature of the matter was highly confidential. (Aurora PFF ¶ 102).

On October 1, 2009, Ms. Hampton sent Ms. Beckwith a letter rescinding the job offer. (Aurora PFF ¶ 103). EHS Kensmoe later told Ms. Beckwith that the offer was rescinded on the basis of her dishonesty regarding her medical records. (Aurora PFF ¶ 104).

At no point during the physical examination or afterwards did PA Hays, LPN Teetzen, or any other individual make any comment about how MS might affect Ms. Beckwith's ability to work as an AVNA nurse. (Aurora PFF ¶¶ 84, 85).

*The EEOC's version of events.* The EEOC agrees that LPN Teetzen was the first Aurora employee to work with Ms. Beckwith after Ms. Beckwith had completed the Form; LPN Teetzen took Ms. Beckwith's vital signs and

---

[31]The EEOC challenges Supervisor Doherty's declaration as a "sham" affidavit. (EEOC Resp. to Aurora PFF ¶ 98; Docket #89 at 30–31). Its basis for doing so, however, largely derives from a semantic dispute over whether Supervisor Doherty believed that Ms. Beckwith "falsified" the Form or simply "failed to disclose" information. Again, this is a topic for attacking Supervisor Doherty's credibility, but it is not the sort of clearly contradictory statement that would cause the Court to view Supervisor Doherty's declaration as a "sham" affidavit.

[32]*See* footnote 30.

performed the medication reconciliation. (EEOC PFF ¶¶ 64–66; Aurora Resp. to EEOC PFF ¶ 64–66). The EEOC also agrees that LPN Teetzen identified Ms. Beckwith's Rebif prescription in performing the medication reconciliation and asked Ms. Beckwith about it. (EEOC PFF ¶ 67). The EEOC, contrary to Aurora, alleges that Ms. Beckwith responded that she was not taking the medication at the time. (EEOC PFF ¶ 68).

The EEOC agrees that PA Hays next conducted the physical examination of Ms. Beckwith (EEOC PFF ¶ 70), but largely disagrees with Aurora's version of what occurred prior to and during the examination. The EEOC asserts that LPN Teetzen told PA Hays about Ms. Beckwith's MS and Rebif prescription *before* PA Hays began the examination. (EEOC PFF ¶ 71). The EEOC also asserts that, during the examination, Ms. Beckwith was immediately forthcoming about her MS and Rebif prescription and agreed to sign a release authorizing Aurora to receive medical information regarding her diagnosis. (EEOC PFF ¶¶ 72, 74, 75).[33] Ms. Beckwith believed that the "mood of the physical examination changed" as a result of her disclosure. (EEOC PFF ¶ 73).

PA Hays called EHS Kensmoe on September 23, 2009 (the day of the exam), and on September 25, 2009, to discuss Ms. Beckwith's physical examination. (EEOC PFF ¶ 80).[34] EHS Kensmoe believes that, at some point, she spoke with PA Hays. (EEOC PFF ¶ 86). PA Hays told EHS Kensmoe that Ms. Beckwith had disclosed her MS and Rebif prescription during the initial

---

[33] At some point on September 24, 2009, or thereafter, PA Hays received Ms. Beckwith's medical records from Dr. Khatri. (EEOC PFF ¶ 77, 78).

[34] PA Hays does not remember calling EHS Kensmoe (EEOC PFF ¶ 81) or even remember who EHS Kensmoe is (EEOC PFF ¶ 82), but EHS Kensmoe's voice mail notes support the fact that PA Hays called her twice (EEOC PFF ¶ 80).

physical examination (EEOC PFF ¶ 88) and that Ms. Beckwith's employment was placed on a medical hold pending receipt of medical records (EEOC PFF ¶ 86). PA Hays also told EHS Kensmoe that Ms. Beckwith had omitted information about her MS and Rebif prescription from the Form. (EEOC PFF ¶ 87).

EHS Kensmoe then called Supervisor Doherty and explained that, according to PA Hays, Ms. Beckwith orally disclosed her MS and Rebif prescription (EEOC PFF ¶ 90), leading to the—in the EEOC's eyes erroneous—belief that Ms. Beckwith had disclosed that information *after* PA Hays *returned* to the exam room during the drug test (as opposed to during the initial examination). (EEOC PFF ¶ 91). EHS Kensmoe also told Supervisor Doherty that PA Hays did not believe that Ms. Beckwith had been forthcoming. (EEOC PFF ¶ 92).

Based upon this information, Supervisor Doherty believed that Ms. Beckwith had not disclosed her MS or Rebif prescription during the physical examination and, thus, had not been forthcoming; this caused Supervisor Doherty to rescind Ms. Beckwith's job offer. (EEOC PFF ¶¶ 95–97).[35] Supervisor Doherty did not perform any investigation and, therefore, did not know, at that moment, whether Ms. Beckwith was taking Rebif or had any symptoms that would have to be disclosed. (EEOC PFF ¶¶ 102, 103, 106, 107). Rather, she relied upon EHS Kensmoe's statement that Ms. Beckwith had not been forthcoming. (*See* EEOC PFF ¶¶ 101–03, 105).

---

[35]The parties agree that Supervisor Doherty had the authority to rescind Ms. Beckwith's offer and was the decision-maker in doing so. (EEOC PFF ¶¶ 99, 100).

### 1.2.3 Additional EEOC Contentions Regarding Aurora Policies and Medical Information Disclosures

The EEOC asserts that this course of events was different than Aurora's typical practice. The EEOC alleges that, typically, Aurora performs an investigation before rescinding a job offer for dishonesty. (*See* EEOC PFF ¶ 112). Here, by contrast, neither EHS Kensmoe nor Supervisor Doherty performed any investigation: Supervisor Doherty relied solely on her phone conversation with EHS Kensmoe; EHS Kensmoe had limited contact with PA Hays and no contact with Ms. Beckwith or LPN Teetzen. (EEOC PFF ¶¶ 109–11). The EEOC also asserts that Supervisor Doherty had an unwritten practice with regard to medical disclosure: if disclosure was made "during the course of the examination," then a failure to disclose on the Form would be forgiven. (EEOC PFF ¶¶ 93, 94). Here, despite the fact that Ms. Beckwith disclosed her MS and Rebif during the initial exam, that disclosure was not enough because it occurred only after Ms. Beckwith was confronted about it, and thus was not voluntary and forthcoming. (EEOC PFF ¶ 96, 112). The EEOC also asserts that Aurora rescinds job offers on the basis of an omission only when the omission relates to a medical condition, and even then certain omissions of minor medical information do not require rescission of the offer. (EEOC PFF ¶¶ 126–30). Aurora largely disputes these practice-related contentions. (*See* Aurora Resp. to EEOC PFF ¶¶ 93, 94, 96, 109–112, 126–30; Aurora SPFF ¶ 7–11).

### 1.3 Summary of Factual Disputes Between Aurora and EEOC

There are many factual disputes between the parties. These can be grouped into three categories: (1) facts related to Ms. Beckwith's medical condition; (2) facts related to Ms. Beckwith's physical examination; and

(3) other, miscellaneous facts that deal with broader contentions about Aurora's policies and disclosure of information.

### 1.3.1   Medical Condition Disputes

There are substantial disputes between the parties over the extent to which Ms. Beckwith's MS affected her ability to function. Aurora has produced evidence that Dr. Khatri believed Ms. Beckwith's MS to be very mild, generally not affecting her ability to function. (*See, e.g.*, Docket #92, Ex. 7 at 41:3–5, 71:13–20, 78:24–79:1). Nonetheless, there is also evidence that Ms. Beckwith *has* suffered from some symptoms, although the extent of those symptoms and their effect on her is not entirely clear. (*See, e.g.*, Docket #92, Ex. 1 at 106:22–109:7; Docket #119, Ex. 10 at 114:17–116:23). Thus, questions of fact regarding Ms. Beckwith's medical condition remain.

### 1.3.2   Physical Examination Disputes

There are also disputed facts related to Ms. Beckwith's physical examination. There are three significant disagreements between the parties.

*First*, they disagree over whether Ms. Beckwith was actually dishonest in checking "No" on the Form in relation to vision problems and numbness. (*See* EEOC SPFF ¶¶ 36, 40; Aurora SPFF ¶ 51). The EEOC argues that Ms. Beckwith was not dishonest, because she needed to check the boxes only if the symptoms had not resolved. (EEOC SPFF ¶¶ 36, 40). In support, the EEOC cites to testimony of an Aurora employee who stated that only unresolved conditions need to be reported. (EEOC SPFF ¶ 36; Docket #89 at 25). There are two problems with this position. To begin, the plain language of the Form requires that a prospective employee check "Yes" if "you are experiencing or *have experienced*" the symptoms. (Docket #92, Ex. 9 at 2). Additionally, Ms. Beckwith did not ask any questions (Aurora PFF ¶ 66), so even if Aurora employees believed that the Form required individuals to

report only unresolved symptoms, Ms. Beckwith would not have known of their understanding. Thus, at best, her "No" answers resulted from a clear misreading of the Form; at worst, they constituted intentional misstatements.

*Second*, the parties disagree over whether Ms. Beckwith told LPN Teetzen that she was taking Rebif most of the time or not at all. (*Compare* Aurora PFF ¶ 72 *with* EEOC PFF ¶ 68). If she told PA Hays that she was taking Rebif most of the time, then her failure to list any current medications would more closely resemble an outright lie than an accidental omission. That is, if she was taking Rebif most of the time, then it certainly would be a current medication. If, on the other hand, she explained that she was not taking Rebif at all at the time, then her failure to list any current medications would be more understandable as an accidental omission. That is, if she were not taking Rebif at all, then she might not believe it to be a current medication even if it was prescribed to her.

A genuine dispute of fact remains as to this point. Ms. Beckwith has offered slightly inconsistent versions of what she told LPN Teetzen regarding her compliance with her medication: either that she said she was not taking it at the time (Docket #119, Ex. 10 at 72:1–73:11, 229:1–14), or she said that she was taking it most of the time (Docket #119, Ex. 1 at 29 (Ex. 64 to Beckwith Dep. (EEOC intake form); internal numbering: EEOC000044)). A jury could believe that either one of those versions is more credible than the other.

*Third*, the parties disagree over when Ms. Beckwith disclosed her MS and Rebif prescription to PA Hays. The EEOC has been somewhat cagey on this point (*see, e.g.*, EEOC PFF ¶ 71–72), but seems to be asserting that Ms. Beckwith readily disclosed the information early in the physical examination process and did so voluntarily. Aurora, on the other hand, asserts that PA Hays performed the entire physical examination, asking Ms. Beckwith

specific questions, without Ms. Beckwith disclosing the information. (*See* Aurora PFF ¶¶ 75–80). According to Aurora, it was not until *after* PA Hays learned of the Rebif prescription and confronted Ms. Beckwith with that information that Ms. Beckwith disclosed her MS and Rebif prescription. (Aurora PFF ¶¶ 81–83). If the EEOC's version of events is correct, of course, it is harder to characterize Ms. Beckwith as dishonest; on the other hand, if Aurora's is true, then Ms. Beckwith appears to have been purposefully providing untruthful answers.

A jury could find either way on this point. While PA Hays may not have independent recollection of performing Ms. Beckwith's physical, she provided very clear testimony, rooted in her review of her notations in Aurora's business records, to support Aurora's version of events. (Docket #92, Ex. 5 at 242:19–245:23). Specifically, PA Hays' notations on pages 2 and 4 of the Form support her contention that: Ms. Beckwith initially failed to disclose her symptoms, diagnosis, and medication; that Ms. Beckwith disclosed the information to PA Hays only after being confronted; and that Ms. Beckwith informed PA Hays that she took Rebif sporadically. (Docket #92, Ex. 9 at 3 (internal page: EEOC 000264) (in "Current Medications," the word "None" in PA Hays' handwriting has been crossed out and replaced with "Rebif SC taking sporadically," with an arrow noting "disclosed" pointing to "disclosed to examiner by LPN Carla"), 5 (internal page: EEOC000266) (noting "Initially failed to disclose MS & med LPN noted not complaint w/ MS med when asked if she had reconciled the meds"; stating "Denies" to "Current Medical Problems")). A jury may find that PA Hays' lack of direct memory undercuts her description of her notations. Or it may find that, because PA Hays performs up to twenty exams per day (Aurora

Resp. to EEOC PFF ¶ 83), it would be understandable for her not to remember a specific patient but be able to analyze her prior notes.

In the end, both the second and third points that remain in dispute as to Ms. Beckwith's physical examination might prove immaterial. The EEOC would argue, in particular, that the time and nature of Ms. Beckwith's disclosure is ultimately unimportant, because Aurora's policy was to forgive any and all omissions, so long as the omissions were corrected during the physical examination. (*See* EEOC PFF ¶¶ 93, 94). Aurora, meanwhile, might argue that the actual nature of these events is irrelevant, because Supervisor Doherty, the ultimate decision-maker, made her decision based upon a version of events that is substantially similar to the one posited by Aurora. (*See* Aurora Resp. to EEOC PFF ¶¶ 99–112). And the parties *do* seem to agree that both Supervisor Doherty and EHS Kensmoe *believed* that Ms. Beckwith made her disclosure to PA Hays only after PA Hays returned to the examination room. (*See* EEOC PFF ¶¶ 91, 92; Aurora Resp. to EEOC PFF ¶¶ 91, 92).

Nonetheless, regardless of whether the second and third points turn out to be material, it is clear that there remain factual disputes in regard to them.

### 1.3.3 Miscellaneous Disputes Regarding Policies and Disclosures

The parties disagree over Aurora's honesty policies. They also disagree over whether Aurora employees made inappropriate disclosures of Ms. Beckwith's medical information. These disputes (and their materiality) are closely related to the law on the topic, so the Court will address the miscellaneous factual disputes regarding policies and disclosures in tandem with its legal analysis in Section 2.2.4, *infra.*

2.    LEGAL ANALYSIS

The EEOC asserts four claims against Aurora:

(1)    the discrimination claim, a claim that Aurora illegally discriminated against Ms. Beckwith on the basis of her MS in violation of 42 U.S.C. § 12112(a);

(2)    the confidentiality claim, a claim that Aurora violated confidentiality portions of the ADA when: (a) Aurora employees disclosed Ms. Beckwith's medical information between each other; and (b) Aurora used Ms. Beckwith's responses to disability-related questions to apply work rules in violation of 42 U.S.C. § 12112(d)(3);

(3)    the additional medical inquiry claim, a claim that Aurora violated 42 U.S.C. § 12112(a) by reviewing its own medical records of Ms. Beckwith's medical care to obtain additional information about Ms. Beckwith's MS; and

(4)    the qualification standard claim, a claim that Aurora had an illegal unwritten practice of rescinding job offers when a prospective employee omitted significant medical information that may require an accommodation, in violation of 42 U.S.C. § 12112(a).

(Docket #1; Docket #95, Ex. 19 at 21–22 (EEOC Third Supp. Resp. to Aurora Interrogatory No. 16)).

Aurora has moved for summary judgment on all four claims. First, it argues that all four claims fail because Ms. Beckwith is neither disabled nor a qualified individual. (Docket #79 at 14–16). Second, Aurora attacks the discrimination claim, specifically, arguing that its decision to rescind Ms. Beckwith's offer of employment was not related to her MS and that it did not make prohibited use of the results of Ms. Beckwith's medical exam. (Docket #79 at 16–22). Third, Aurora requests dismissal of the remaining three claims—the confidentiality, additional medical inquiry, and qualification standard claims—arguing that those claims are procedurally barred and

factually unsupported. (Docket #79 at 22–28). Fourth, Aurora asserts that the EEOC's request for injunctive relief is moot. (Docket #79 at 28).

The EEOC has cross-moved for summary judgment in several respects. First, it requests that the Court conclusively find that Ms. Beckwith is disabled under 42 U.S.C. § 12102(1). (Docket #72 at 5–16). Second, the EEOC requests summary judgment on the confidentiality claim, arguing that the ADA prohibits the manner in which Aurora disclosed and used Ms. Beckwith's responses from the physical examination. (Docket #72 at 16–25). Third, the EEOC asks the Court to bar Aurora from presenting to the jury Aurora's proffered legitimate, non-discriminatory reason for rescinding Ms. Beckwith's offer of employment. (Docket #72 at 25–26). Fourth, the EEOC calls for dismissal of Aurora's equitable defenses. (Docket #72 at 26–29).

## 2.1    Summary Judgment Standard of Review

"A motion for summary judgment is a contention that the material facts are undisputed and the movant is entitled to judgment as a matter of law. The party pursuing the motion must make an initial showing that the agreed-upon facts support a judgment in its favor." *Hotel 71 Mezz Lender LLC v. Nat'l Ret. Fund*, 778 F.3d 593, 601 (7th Cir. 2015) (citing Fed. R. Civ. P. 56(a), (c)(1); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986); *Outlaw v. Newkirk*, 259 F.3d 833, 837 (7th Cir. 2001); *Logan v. Commercial Union Ins. Co.*, 96 F.3d 971, 978–79 (7th Cir. 1996)). In reviewing a motion for summary judgment, the Court must "view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor." *King v. McCarty*, 781 F.3d 889, 895 (7th Cir. 2015) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *McGee v. Adams*, 721 F.3d 474, 480 (7th Cir. 2013)).

Where "the movant is seeking summary judgment on a claim as to which it bears the burden of proof, it must lay out the elements of the claim, cite the facts which it believes satisfies these elements, and demonstrate why the record is so one-sided as to rule out the prospect of a finding in favor of the non-movant on the claim." *Hotel 71*, 778 F.3d at 601 (citing *Reserve Supply Corp. v. Owens–Corning Fiberglass Corp.*, 971 F.2d 37, 42 (7th Cir. 1992); *United States v. Four Parcels of Real Property in Greene & Tuscaloosa Counties in State of Ala.*, 941 F.2d 1428, 1438 (11th Cir. 1991)). "If the movant has failed to make this initial showing, the court is obligated to deny the motion." *Hotel 71*, 778 F.3d at 601–02 (citing *Johnson v. Hix Wrecker Serv., Inc.*, 651 F.3d 658, 662 (7th Cir. 2011) ("A party opposing summary judgment does not have to rebut factual propositions on which the movant bears the burden of proof and that the movant has not properly supported in the first instance."); *Johnson v. Gudmundsson*, 35 F.3d 1104, 1112 (7th Cir. 1994) (even an unanswered motion for summary judgment cannot be granted unless the movant has shown that the facts warrant judgment in its favor)).

### 2.2    Analysis of Parties' Specific Arguments

There is significant overlap between the parties' arguments, so the Court will address the arguments together when possible. First, the Court will address both parties' arguments as to whether Ms. Beckwith, in fact, suffers from a disability. Second, the Court will address Aurora's argument that Ms. Beckwith was not a "qualified individual." Third, the Court will address Aurora's attack on the discrimination claim, together with the EEOC's closely-related argument attacking Aurora's proffered reason for rescinding Ms. Beckwith's offer. Fourth, the Court will address Aurora's request that the Court dismiss the EEOC's confidentiality, additional medical inquiry, and qualification standard claims; at the same time, the Court will

address the EEOC's related request for summary judgment on the confidentiality claim. Fifth, the Court will address Aurora's argument that the EEOC's request for injunctive relief is moot. Sixth, the Court will address the EEOC's request for dismissal of Aurora's equitable defenses.

### 2.2.1 Disability

As a preliminary issue, Aurora's actions would not violate the ADA unless Ms. Beckwith has a disability as defined by 42 U.S.C. § 12102. *See, e.g.*, 42 U.S.C. §§ 12112(a), (d)(3); *EEOC v. AutoZone, Inc.*, 630 F.3d 635, 639–645 (7th Cir. 2010). *Accord Sutton v. United Air Lines, Inc.*, 527 U.S. 471, 481 (1999).

Under 42 U.S.C. § 12102(1), and individual can be said to have a disability if he or she has: (1) "a physical or mental impairment that substantially limits one or more life activities"; (2) "a record of such impairment"; or (3) is "regarded as having such an impairment." *Dickerson v. Bd. of Trustees of Community College Dist. No. 522*, 657 F.3d 595, 600 (7th Cir. 2011) (citing 42 U.S.C. § 12102(1)). Neither party is entitled to summary judgment as to any of these three formulations.

The parties disagree over whether Ms. Beckwith has "a physical or mental impairment that substantially limits one or more major life activities," to qualify as disabled under 42 U.S.C. § 12102(1)(A). Aurora argues that Ms. Beckwith has never been "substantially limited" in her life activities, given her mild case of MS. The EEOC, on the other hand, argues that Ms. Beckwith's MS is a disability, practically *per se*, even if it is often inactive. There are substantial factual disputes between the parties about the extent of Ms. Beckwith's condition, *see* Section 1.2.1, *supra*, thus preventing the Court from ruling one way or another on summary judgment. There is a general understanding that MS is a disabling condition, 29 C.F.R. § 1630.2(j)(3)(ii), and the Seventh Circuit has recognized that an ongoing condition that is

episodic may constitute a disability if, even only at one time, the active symptoms of that condition substantially impaired a major life activity, *see Gogos v. AMS Mechanical Systems, Inc.*, 737 F.3d 1170, 1172–1173 (7th Cir. 2013) (citing 29 C.F.R. Pt. 1630, App. at § 1630.2(j)(1)(vii)). In combination with the Court's obligation to draw reasonable inferences in the EEOC's favor in addressing Aurora's motion for summary judgment, *see King*, 781 F.3d at 895, those authorities make clear that the Court cannot grant summary judgment to Aurora on this point. The EEOC also is not entitled to summary judgment. It bears the burden of proving that Ms. Beckwith is disabled. Viewing the evidence in the light most favorable to Aurora, particularly Dr. Khatri's general belief that Ms. Beckwith's condition was mild, the evidence is not so one-sided as to compel a finding that Ms. Beckwith satisfies 42 U.S.C. § 12102(1)(A), precluding summary judgment in favor of the EEOC on this point. *See Hotel 71*, 778 F.3d at 601.

The parties run into the same issues with regard to 42 U.S.C. § 12102(1)(B) and (C). 29 C.F.R. § 1630.2(k)(1) clarifies that an individual has a record of disability under 42 U.S.C. § 12102(1)(B) if the individual has a history of an impairment that limits one or more major life activities. Again, in light of the conflicting evidence from the parties regarding the limiting effect of Ms. Beckwith's MS, and drawing reasonable inferences in favor of the non-moving party on the opposing party's summary judgment motion, the Court must deny each party's motion. Meanwhile, as to 42 U.S.C. § 12102(1)(C), an employer may be liable for taking adverse action against an employee when it regards the employee as disabled under 42 U.S.C. § 12102(1)(C), even if the perceived impairment does not (or is not perceived to) limit a major life activity. 42 U.S.C. § 12102(3)(A). This vitiates the importance of the disputed facts regarding the limiting effect of Ms.

Beckwith's MS. The EEOC, however, still has not presented evidence that is so one-sided as to carry its burden to show that Aurora *regarded* Ms. Beckwith as disabled; summary judgment is, accordingly, not appropriate in the EEOC's favor on that point. *See Hotel 71*, 778 F.3d at 601. There is, however, enough evidence for the EEOC to escape Aurora's motion for summary judgment on this point. Drawing reasonable inferences in the EEOC's favor, *King*, 781 F.3d at 895, the EEOC could prevail in proving that Aurora regarded Ms. Beckwith as disabled, again making summary judgment inappropriate on this issue.

For these reasons, the Court is obliged to deny both parties' motions insofar as they seek a ruling in their favor on the issue of disability.

### 2.2.2    Qualified Individual

An adverse employment action does not violate 42 U.S.C. § 12112 unless taken against a "qualified individual." 42 U.S.C. § 12112(a). A qualified individual is one "who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8).

Aurora argues that, "[e]ven if Beckwith were disabled, she was not qualified for the…position." (Docket #79 at 16). Aurora's only argument in this regard is that Ms. Beckwith's actions in filling out the Form and during the physical examination failed Aurora's "unambiguous policy that makes honesty a qualification for all jobs." (Docket #114 at 4). The EEOC, on the other hand, argues that Aurora's alleged honesty policy is nothing more than a "loose, malleable, aspirational concept[]," and certainly not an essential function.

The parties have produced conflicting evidence on this issue, precluding summary judgment. Perhaps most importantly, it is not clear

whether honesty was an essential job function. Aurora asserts that it was. This would be understandable, given the fact that Ms. Beckwith would potentially be required to operate in a patient's home and to fill out medical forms, all without supervision. But the EEOC also points out that the "essential functions" listed for the position offered to Ms. Beckwith does not include honesty. (Docket #94, Ex. 3). Aurora's judgment on this issue is appropriately considered, but the written essential functions are of great importance in this regard, 42 U.S.C. § 12111(8), so the Court views Aurora's failure to list honesty therein as very important. In the end, factual issues remain on this topic, making summary judgment inappropriate. *See Kauffman v. Petersen Health Care VII, LLC*, 769 F.3d 958, 961 (7th Cir. 2014) ("[u]nresolved factual disputes vitiate the judge's analysis" that a certain duty was an essential part of a job); *Winfrey v. City of Chicago*, 259 F.3d 610, 615–17 (7th Cir. 2001).

There is, of course, also conflicting evidence about what occurred during the physical examination. The Court is, accordingly, also reluctant to determine that Ms. Beckwith did or did not possess the quality of honesty, such that she would or would not be qualified if honesty is an essential job function.

These are both issues to present to a jury.

### 2.2.3 The Discrimination Claim

The real meat of Aurora's summary judgment motion is its contention that Ms. Beckwith's discrimination claim should be dismissed because Ms. Beckwith cannot prove that Aurora rescinded her offer because of her MS. To avoid summary judgment on this claim, the EEOC "can rely on two different methods of proof": the direct method or indirect method. *Bunn v. Khoury Enterprises, Inc.*, 753 F.3d 676, 683–686 (7th Cir. 2014); *Dickerson*, 657

F.3d at 601 (citing *Robin v. Espo Eng'g Corp.*, 200 F.3d 1081, 1088 (7th Cir. 2000)).

### 2.2.3.1  Direct Method

To escape Aurora's motion for summary judgment using the direct method, the EEOC

> must show that a genuine issue of material fact exists with respect to each of the three elements [it] will eventually be required to prove at trial: (1) that [Ms. Beckwith] is disabled within the meaning of the ADA; (2) that [Ms. Beckwith] is qualified to perform the essential functions of the job with or without accommodation; and (3) that [Ms. Beckwith] has suffered an adverse employment action because of [her] disability.

*Bunn*, 753 F.3d at 683 (citing *Timmons v. Gen. Motors Corp.*, 469 F.3d 1122, 1127 (7th Cir. 2006)). The Court has already discussed the first two of those elements, leaving only the third to be addressed.

The EEOC can establish that third element—"tying an adverse employment action to a discriminatory animus"—by producing "either direct or circumstantial evidence." *Bunn*, 753 F.3d at 683–84 (citing *Dickerson*, 657 F.3d at 601). Direct evidence, such as an admission of discriminatory intent, is extremely rare. *Bunn*, 753 F.3d at 684. Thus, plaintiffs most often rely on circumstantial evidence to prove up the third element. *Id.* Circumstantial evidence might include:

> (1) suspicious timing; (2) ambiguous statements or behavior towards other employees in the protected group; (3) evidence, statistical or otherwise, that similarly situated employees outside of the protected group systematically receive better treatment; and (4) evidence that the employer offered a pretextual reason for an adverse employment action.

*Dickerson*, 657 F.3d at 601 (citing *Diaz v. Kraft Foods Global, Inc.*, 653 F.3d 582, 586–87 (7th Cir. 2011); *Burnell v. Gates Rubber Co.*, 647 F.3d 704, 708 (7th Cir.

2011)). The EEOC asserts that it has both direct and circumstantial evidence that ties Aurora's rescission of Ms. Beckwith's offer[36] to discriminatory animus.

As to *direct evidence*, the EEOC asserts that Aurora's honesty policy is *per se* discriminatory. Specifically, the EEOC argues that Aurora applies its honesty policy only to people with disabilities. (Docket #89 at 14–15). In support, the EEOC points out that not all omissions from the Form result in rescission of employment offers; for instance, omissions of non-medical information or temporary or minor medical conditions generally went unreported and unpunished. (Docket #89 at 15 (citing EEOC SPFF ¶ 67)). Generally, Aurora rescinded offers for dishonesty only when the dishonesty related to a significant medical condition that might impact a prospective employee's ability to perform work. (Docket #89 at 15 (citing EEOC SPFF ¶¶ 27, 28, 68, 69, 71)). The EEOC posits that this practice focused directly on prospective employees' disabilities, including Ms. Beckwith's MS. (Docket #89 at 15–16).

Aurora disagrees. It argues that it has a reason for focusing on dishonesty that is related to a significant medical condition: the Form is designed to help Aurora determine whether prospective employees will need any accommodations to perform their job, so omissions of more serious medical information directly undermine the purpose of the Form. (Docket #114 at 6). Additionally, Aurora has withdrawn job offers for dishonesty unrelated to medical conditions (Aurora PFF ¶ 107), supporting its

---

[36]The parties do not appear to disagree that the rescission of Ms. Beckwith's offer was an adverse employment action.

contention that its rescission of job offers is related to dishonesty rather than medical status.

On this point, the Court agrees with Aurora: the EEOC has not produced any direct evidence of discriminatory animus. The policy that the EEOC points to appears to apply generally to all forms of dishonesty, whether medical or non-medical. (Docket #83, Ex. 1 (showing rescinded offers of employment for "Undisclosed conviction found on criminal background check," "Falsification of Application," "Falsification of Health History Assessment," and "failure to successfully complete pre-employment requirements.")). Therefore, it does not appear that Aurora's honesty policy applies only in the medical context. And, to the extent that the Court were to view it as applying only in the medical context, Aurora has offered up a good reason why it rescinded offers only after non-disclosure of significant medical issues: such non-disclosure totally undermines Aurora's attempts to craft accommodations for its prospective employees. By no means is this "an admission by the decision maker that his or her actions were based upon the prohibited animus," as *Dickerson* stated was required to constitute direct evidence. 657 F.3d at 601 (citing *Buie v. Quad/Graphics, Inc.*, 366 F.3d 496, 503 (7th Cir. 2004)). The EEOC also has not identified any other direct evidence of discriminatory animus.

As to *circumstantial evidence*, the EEOC identifies only one piece of evidence: the allegedly-suspicious timing of Aurora's decision to rescind Ms. Beckwith's offer. (Docket #89 at 16–17) (citing *Buie*, 366 F.3d at 506–07; *Bullock v. Balis & Co., Inc.*, No. 99-CV-748, 2000 WL 1858719, at *5 (E.D. Pa. Dec. 19, 2000), for the proposition that suspicious timing alone may create an issue of causation). The EEOC posits that if Aurora "truly rescinded Beckwith's offer

for falsifying or omitting response from the Form, then her disease would not have been relevant or warranted comment." (Docket #89 at 16–17).

Unfortunately for Aurora, that single piece of evidence is enough for the EEOC to escape summary judgment. Generally, temporal proximity between an adverse employment action and the employer's having learned of the employee's disability is not enough to create a triable issue of fact. *See Tomanovich v. City of Indianapolis*, 457 F.3d 656, 665 (7th Cir. 2006). But when the temporal proximity is mere "days, or at most, weeks," a causal nexus may be inferred. *Mobley v. Allstate Ins. Co.*, 531 F.3d 539 (7th Cir. 2008). The Court acknowledges that Aurora supplies a reason for the temporal proximity: it was only upon learning of Ms. Beckwith's MS that Aurora also learned that she had lied. But the Court cannot weigh the credibility of Aurora's reasoning; that is for the jury.[37]

That principle, combined with the Court's obligation to draw all reasonable inferences in favor of the EEOC at this summary judgment stage, *see King*, 781 F.3d at 895, persuades the Court that summary judgment would not be appropriate at this stage of the case. Thus, the Court will deny Aurora's motion for summary judgment on the EEOC's discrimination claim.

### 2.2.3.2   Indirect Method

The indirect method of proof was "originally developed in the Title VII context by *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)," and "exists only to help plaintiffs survive summary judgment…[thus] fall[ing] away at the trial stage." *Bunn*, 753 F.3d at 685. Thus, because the Court has found that the EEOC can escape summary judgment under the direct

---

[37] Additionally, the Court notes that the lack of investigation, together with the temporal proximity, combine to paint a slightly stronger circumstantial picture for the EEOC.

method, it need not analyze the parties' arguments regarding the indirect method.

### 2.2.4 Confidentiality, Additional Medical Inquiry, and Qualification Standard Claims

Aurora challenges the EEOC's confidentiality, additional medical inquiry, and qualification standard claims on both procedural and substantive grounds.

Both procedural grounds fail. Aurora argues that the EEOC's confidentiality, additional medical inquiry, and qualification standard claims are barred because the EEOC failed to include them in its complaint. But the Court agrees with the EEOC that the complaint did not need to include specific *legal* theories, "only facts sufficient to show that [its] claim has substantive plausibility." *Johnson v. City of Shelby, Miss.*, 135 S.Ct. 346, 347 (per curiam); *accord Runnion v. Girl Scouts of Greater Chicago and Northwest Indiana*, No. 14-1729, slip. op., at 6 (7th Cir. May 8, 2015). Aurora also argues that the EEOC's failure to conciliate these three claims should result in their dismissal. The Supreme Court just recently decided that trial courts can review the EEOC's conciliation efforts. *Mach Mining, LLC v. EEOC*, No. 13-1019, slip op., at 14 (S.Ct. Apr. 29, 2015). But the remedy for failure to conciliate "is to order the EEOC to undertake the mandated efforts to obtain voluntary compliance," as opposed to dismissal of suit. *Id.* Therefore, the Court must deny Aurora's motion for summary judgment on this point. Under *Mach Mining*, though, Aurora may request that the Court order the EEOC to undertake conciliation efforts.

As to the merits, the Court is obliged to dismiss certain portions of the claims and leave others intact.

### 2.2.4.1  Confidentiality Claim

Perhaps the most important of the three remaining issues is the EEOC's confidentiality claim. With it, the EEOC alleges that Aurora violated 42 U.S.C. § 12112(d)(3)(B) when PA Hays disclosed Ms. Beckwith's responses on the Form to EHS Kensmoe. The EEOC argues that this disclosure was to an unauthorized individual and for an unauthorized purpose. The EEOC also argues that Aurora "used" the confidential information for unlawful purposes when EHS Kensmoe and Supervisor Doherty decided to rescind Ms. Beckwith's offer of employment for dishonesty.

As to PA Hays' disclosure to EHS Kensmoe, Aurora is clearly entitled to summary judgment. Title 42 U.S.C. § 12112(d)(3)(B)(i) provides that "supervisors and managers may be informed [of confidential information] regarding necessary restrictions on the work or duties of the employee and necessary accommodations." The Seventh Circuit, relying on EEOC guidance, acknowledged that employers "'may only share [confidential] information with individuals involved in the hiring process who need to know the information.'" *O'Neal v. City of New Albany*, 293 F.3d 998, 1009 (7th Cir. 2002) (citing EEOC Compl. Man. (CCH) ¶ 6903, at 5380). EHS Kensmoe was an employee health specialist in 2009, and in that capacity she determined whether conditional employees would be able to meet the physical demands of jobs for which they had been hired. (Docket #92, Ex. 6 at 10:8–14:5). To the Court, this certainly makes EHS Kensmoe a supervisor or manager who would need the information in order to evaluate the necessity of accommodations. The EEOC has not produced any evidence to the contrary, and, even drawing all reasonable inferences in the EEOC's favor, the Court would conclude that EHS Kensmoe was entitled to receive

this information under 42 U.S.C. ¶ 12112(d)(3)(B)(ii).[38] Thus, Aurora cannot be liable for PA Hays' disclosure to EHS Kensmoe.[39]

On the other hand, Aurora is not entitled to summary judgment as to the "use" of the confidential information by EHS Kensmoe and Supervisor Doherty. To the extent that Aurora can prove that its decision to rescind Ms. Beckwith's offer was based upon her provision of untruthful answers on the Form and during the physical examination, such use would be permissible. Title 42 U.S.C. § 12112(d)(3)(B) prohibits disclosure of "information obtained regarding the medical condition or history of the applicant" and 42 U.S.C. § 12112(d)(3)(C) prohibits use of "the results" of an examination for a purpose inconsistent with the ADA. If Ms. Beckwith provided false answers in her physical examination, Aurora's use of those false answers would not violate 42 U.S.C. §§ 12112(d)(3)(B) or (C). The Court doubts that false answers should be treated as information regarding the medical condition or history of Ms. Beckwith, under 42 U.S.C. § 12112(d)(3)(b), or results of a medical examination, under 42 U.S.C. § 12112(d)(3)(C). Furthermore, if Aurora relied upon Ms. Beckwith's untruthful statements, they cannot be said to have discriminated against Ms. Beckwith on the basis of her disability, so any use of the results of Ms. Beckwith's examination would be in accordance with the ADA. This is consistent with at least some of the EEOC's prior guidance, EEOC Technical Assistance Manual, § 9.8 ("An employer may refuse to hire or may fire a person who knowingly provides a false answer to a lawful post-

---

[38]Perhaps EHS Kensmoe and Supervisor Doherty ultimately *used* the information for another purpose, but the EEOC has not produced any evidence that PA Hays disclosed the information for any reason other than a permissible one.

[39]Though it minces its words, the EEOC appears to agree. (Docket #109 at 10).

offer inquiry about his/her condition or workers compensation history."), although the EEOC now states that such guidance is unavailable and has been superseded. In any event, the Court's understanding can be the only correct understanding. Otherwise, 42 U.S.C. § 12112(d)(3) would essentially allow all prospective employees to lie during post-offer physicals. The EEOC's position would give prospective employees a free pass to lie—even blatantly—because any reports of those lies and later reliance thereon would supposedly constitute impermissible "use" by the employer. This might render pre-employment physicals worthless (could an employer ever trust a prospective employee's answers?), and would certainly make employers' efforts to provide reasonable accommodations much more difficult (an outcome the EEOC should hope to avoid).

In the end, the Court finds that neither party should be entitled to summary judgment on this aspect of the confidentiality claim. If Aurora can show that Ms. Beckwith had been untruthful and that Aurora relied on her untruthful responses, it should prevail on this claim. To the extent that the parties continue to disagree on this issue, they should address the matter further in their jury instruction submissions, providing strong legal authority to support their jury instruction request and, potentially, seeking dismissal.

## 2.2.4.2 Additional Medical Inquiry Claim

The Court is obliged to dismiss the additional medical inquiry claim.[40] The EEOC alleges that Aurora violated 42 U.S.C. § 12112(a) by reviewing its own records of Ms. Beckwith's medical care—apart from the information gleaned from the pre-employment physical (remember, Ms. Beckwith was a patient of Aurora before applying to work for AVNA)—to obtain additional information about Ms. Beckwith's MS. This claim fails because the EEOC has produced no evidence, aside from a note on a letter from Dr. Khatri, that Aurora ever received any documentation regarding Ms. Beckwith's condition aside from what Ms. Beckwith authorized Aurora to receive from Dr. Khatri. That "mere scintilla" of evidence—a note that does not even establish that Aurora ever made a records request—is not enough to overcome Aurora's motion for summary judgment. *Chaib v. Indiana*, 744 F.3d 974, 981 (7th Cir. 2014) (citing *Nat'l Inspection & Repairs, Inc. v. George S.*

---

[40]The Court points out that the EEOC has largely ignored both the additional medical inquiry and qualification standard claims in both seeking summary judgment and in responding to Aurora's motion. The Court cannot find any place in the EEOC's briefs where the EEOC specifically addresses the merits of the claims. While this does not constitute a waiver of the EEOC's arguments on this point, it may constitute an admission of the related facts. *Gerhartz v. Richert*, 779 F.3d 682, 685–86 (7th Cir. 2015) (citing *Flynn v. Sandahl*, 58 F.3d 283, 288 (7th Cir. 1995); *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 161 (1970); *Keeton v. Morningstart, Inc.*, 667 F.3d 877, 884 (7th Cir. 2012)). The Court, however, is aware that the EEOC has disputed many of the related facts, so the failure to address the merits of the claims may not even rise to the level of factual admissions. *Gerhartz*, 779 F.3d at 685–86 (failure to respond to argument amounts to "at most" an admission of facts) (citing *Flynn*, 58 F.3d at 288). In any event, it is unfortunate that the EEOC did not respond. If the EEOC did not intend to pursue the theory beyond the point of summary judgment, it should have made that clear so as to save the Court and Aurora the cost of deciding and briefing the issues. If the EEOC did intend to pursue the theory, it should have briefed the issues to provide the Court with a better understanding of the EEOC's position and also to give Aurora an opportunity to reply.

*May Int'l Co.*, 600 F.3d 878, 882 (7th Cir. 2010)). Without more (and the EEOC has not produced any more), a jury could not reasonably find for the EEOC on this claim. *Harris N.A. v. Hershey*, 711 F.3d 794, 799 (7th Cir. 2013) (citing *Ptasznik v. St. Joseph Hospital*, 464 F.3d 691, 694 (7th Cir. 2006); *Anderson*, 477 U.S. at 252). For this reason, the Court is obliged to grant Aurora's motion for summary judgment on the EEOC's additional medical inquiry claim.

### 2.2.4.3  Qualification Standard Claim

As to the qualification standard claim, the EEOC seems to be arguing that Aurora's practice of rescinding offers for qualified individuals who provide untruthful information is a qualification standard as discussed by 42 U.S.C. § 12112(b)(6). That section states that it constitutes illegal discrimination to use qualification standards "that screen out or tend to screen out an individual with a disability or a class of individuals with disabilities unless the standard…as used by the covered entity, is shown to be job-related for the position in question and is consistent with business necessity." The EEOC escapes summary judgment on this claim for several reasons.

First, the evidence is equivocal as to whether Aurora's alleged policy "screen[s] out or tend[s] to screen out" individuals with disabilities. To be sure, to the extent that there is such a policy, it has resulted in rescission of offers to individuals *without* disabilities far more often than to those with disabilities. (*See, e.g.*, Aurora PFF ¶¶ 6, 8, 9, 26, 27, 107; Docket #83, Ex. 1). But that may be a function of the fact that individuals with disabilities form a small percentage of the population as a whole. Perhaps the alleged policy impacts individuals with disabilities at a much higher rate than it does individuals without disabilities, thus "tending" to screen out individuals with disabilities. At trial, the EEOC will have to prove that Aurora's alleged

policy screens out or tends to screen out individuals with disabilities, which may be difficult given the current state of the evidence. But the EEOC has, at least, produced enough evidence on this point to overcome summary judgment.

Second, it is Aurora's burden to show that, if there is a policy that screens out or tends to screen out individuals with disabilities, such policy is job-related and consistent with business necessity. *See Bates v. United Parcel Service, Inc.*, 511 F.3d 974, 996–98 (9th Cir. 2007); *Hendricks-Robinson v. Excel Corp.*, 154 F.3d 685, 698–99 (7th Cir. 1998). There is only limited case law regarding the required showings for job relation and business necessity under 42 U.S.C. § 12112(b)(6), but the Ninth Circuit has discussed the requirements through the lens of similar phrases in other portions of the ADA or other employment discrimination statutes. *See Bates*, 511 F.3d at 996–97. In *Bates*, the Ninth Circuit stated that "[t]o show 'job-relatedness,' an employer must demonstrate that the qualification standard fairly and accurately measures the individual's ability to perform the essential functions of the job." *Id.* at 996 (citing *Cripe v. City of San Jose*, 261 F.3d 877, 890 (9th Cir. 2001); H.R.Rep. No. 101–485(III), at 32 (1990), *reprinted in* 1990 U.S.C.C.A.N. 445, 454–55; *Belk v. Sw. Bell Tel. Co.*, 194 F.3d 946 (8th Cir. 1999); *Hendricks–Robinson v. Excel Corp.*, 154 F.3d 685, 699 (7th Cir. 1998)). Meanwhile, "[t]o show that the disputed qualification standard is 'consistent with business necessity,' the employer must show that it 'substantially promote[s]' the business's needs." *Bates*, 511 F.3d at 996 (quoting *Cripe*, 261 F.3d at 890; citing *Bentivegna v. U.S. Dep't of Labor*, 694 F.2d 619, 621–22 (9th Cir. 1982)). Aurora has not met its burden in either regard. Indeed, as the Court has already stated, the factual issue of whether honesty is an essential function of the job remains. *See* Section 2.2.2, *supra*.

For these reasons, the Court is obliged to deny Aurora's motion for summary judgment on the EEOC's qualification standard claim.

### 2.2.5    The EEOC's Request for Injunctive Relief

The Court will allow the EEOC to proceed on its request for injunctive relief. The Seventh Circuit has instructed courts not to "dismiss a case as moot if the defendant voluntarily ceases the allegedly improper conduct, as [Aurora] has done, but where the defendant remains free to return to the challenged conduct at any time." *EEOC v. Fed. Exp. Corp.*, 558 F.3d 842, 848 (7th Cir. 2008) (quoting *Friends of the Earth, Inc v. Laidlaw Envtl. Servs., Inc.*, 528 U.S. 167, 189 (2000)). Additionally, neither party has briefed the merits of this issue well enough for the Court to decide it on that basis. (*See* Docket #79 at 29 (providing a single conclusory sentence that Aurora's practice is permissible); Docket #89 at 30 (in addressing merits, providing no legal support for position); Docket #114 at 15 (offering two conclusory sentences without legal support)).

### 2.2.6    Aurora's Equitable Defenses

Aurora hopes to maintain several defenses: failure to state a claim, waiver, estoppel, and unclean hands. The EEOC asks the Court to bar Aurora from asserting these defenses.

At this juncture, the failure to state a claim defense is unavailable to Aurora. While Rule 12(h)(2) allows a motion to dismiss for failure to state a claim to be raised as late as trial, that provision is in conflict with the terms of Rule 12(b), which requires such motion to be made before the service of a responsive pleading. *See* § 1357, Motions to Dismiss—Practice Under Rule 12(b)(6), 5B Fed. Prac. & Proc. Civ. § 1357 (3d ed.). "Technically therefore a post-answer Rule 12(b)(6) motion is untimely and the cases indicate that some other vehicle, such as a motion for judgment on the pleadings or for

summary judgment, must be used to challenge the plaintiff's failure to state a claim for relief. *Id.* (collecting cases). Aurora has certainly had the opportunity to file such a motion—this order is evidence of that. And, in our notice pleading system, any further opportunity to attack the pleadings would be unavailing. At this point, the pleadings have served their purpose; discovery has occurred and the parties are now able to present their cases to a jury. And, of course, in presenting its case to the jury, Aurora can assert that the evidence does not establish the EEOC's claims.

Aurora's remaining defenses, however, remain viable for the time being. As a preliminary matter, the Court excuses any pleading issues, noting that forfeiture of affirmative defenses only results when a plaintiff is harmed by a defendant's delay in failing to plead them. *Garofalo v. Vill. of Hazel Crest*, 754 F.3d 428, 436 (7th Cir. 2014) (quoting *Matthews v. Wis. Energy Corp., Inc.*, 642 F.3d 565, 570 (7th Cir. 2011)). Here, the EEOC was not harmed by any pleading issues: it has known the basis of the defenses and had an opportunity to seek discovery thereon. (*See* EEOC PFF ¶¶ 137–139).

The waiver defense escapes summary judgment with two important caveats. The parties substantially dispute whether Ms. Beckwith assented to the waiver in question, and this question is one of fact that would have to be decided by the jury. But—the first caveat—Aurora cannot argue that Ms. Beckwith waived her *claim* prospectively by assenting to the waiver. *Riley v. Am. Family Mut. Ins. Co.*, 881 F.2d 368, 371 n.6 (7th Cir. 1989) (in context of Title VII claim, noting that plaintiff could waive her claim as part of a settlement, but that "[p]rospective waivers would be unenforceable."). Aurora argues that it is not pursuing that argument. (Docket #98 at 28 ("Aurora is not alleging waiver of a claim, but instead that Beckwith waived her right to be employed."). However, Aurora does not provide any legal

support for a "waiver of right to be employed" defense. Thus, the parties may brief this matter further in submitting proposed jury instructions. And—the second caveat—if Aurora is unable to produce legal support for this defense in submitting jury instructions, the Court will bar it from asserting the defense at trial.

Aurora's unclean hands defense also survives summary judgment. The EEOC argues that "[i]t is undisputed that, in compliance with Aurora's practice, Beckwith orally disclosed her disability and medication to Teetzen and Hays." (Docket #109 at 14; *see also* Docket #72 at 29). Of course, the parties continue to dispute both the nature of Aurora's practices and whether and when Ms. Beckwith disclosed her disability. Thus, material issues of fact remain on this issue, precluding summary judgment.

Finally, the Court will also deny the EEOC's motion for summary judgment on Aurora's estoppel defense. The EEOC did not provide any argument in support of its motion for summary judgment on that issue. (*See* Docket #72). Even on reply, the EEOC has not addressed the issue in any detail. (Docket #109 at 14–15). Simply put, the EEOC has not provided the Court with enough reason to grant summary judgment in its favor on the issue. The parties may address this issue further in their jury instruction submissions and, if the Court finds that Aurora lacks a legal or factual basis for the defense, the Court will bar its presentation at trial.

3.      CONCLUSION

In summary, the Court will grant in part and deny in part each party's motion for summary judgment. As more fully discussed above, the following issues remain for trial:

(1)      whether Ms. Beckwith is disabled, has a record of disability, or was regarded as disabled, 42 U.S.C. § 12102(1) (*see* Section 2.2.1, *supra*);

(2)      whether Ms. Beckwith is a qualified individual, 42 U.S.C. § 12111(8) (*see* Section 2.2.2, *supra*);

(3)      whether Aurora discriminated against Ms. Beckwith on the basis of her MS, 42 U.S.C. § 12112(a) (*see* Section 2.2.3, *supra*);

(4)      whether Supervisor Doherty and EHS Kensmoe illegally "used" Ms. Beckwith's confidential information, 42 U.S.C. § 12112(d)(3) (*see* Section 2.2.4.1, *supra*);

(5)      whether Aurora has an honesty policy that constitutes an unlawful qualification standard, 42 U.S.C. §§ 12112(a), (b)(6) (*see* Section 2.2.4.3, *supra*);

(6)      whether the EEOC is entitled to injunctive relief against Aurora *(see* Section 2.2.5, *supra*); and

(7)      Aurora's waiver, unclean hands, and estoppel defenses (*see* Section 2.2.6, *supra*).

On the other hand, the Court has granted summary judgment in several respects:

(1)      dismissing the EEOC's confidentiality claim insofar as it relied upon PA Hays' disclosure of information, 42 U.S.C. § 12112(d)(3) (*see* Section 2.2.4.1, *supra*);

(2)      dismissing the EEOC's additional medical inquiry claim, 42 U.S.C. § 12112(a) (*see* Section 2.2.4.2, *supra*); and

(3)      barring Aurora from asserting a failure-to-state-a-claim defense (*see* Section 2.2.6, *supra*).

Having addressed the parties' motions for summary judgment, the time has come to bring this case to conclusion. As reflected in the detailed trial scheduled order which follows, this case will be tried before a jury beginning on Monday, July 13, 2015.

In the interim, the Court urges counsel and their respective clients to confer with one another to discuss the possibility of reaching a resolution of the case in whole or in part. The parties shall file a report under seal not later than June 25, 2015, detailing their efforts in this regard.

Finally, the Court will deny as moot the EEOC's motion to strike Aurora's supplemental proposed findings. (Docket #120). The Court did not rely on any of those supplemental facts in reaching its decision.

Accordingly,

IT IS ORDERED that, as more fully described above, both parties' motions for summary judgment (Docket #71, #78) be and the same are hereby GRANTED in part and DENIED in part; and

IT IS FURTHER ORDERED that the EEOC's motion to strike Aurora's supplemental proposed findings of fact (Docket #120) be and the same is hereby DENIED as moot.

Dated at Milwaukee, Wisconsin, this 14th day of May, 2015.

BY THE COURT:

J.P. Stadtmueller
U.S. District Judge